## No. WR-CV-178-84

# District Court of the Navajo Nation
# Judicial District of Window Rock

Navajo Tribe of Indians, *Plaintiff,*
*vs.*
Jane Yellowhorse Jones and
Dennis Jones, *et al., Defendants..*
Decided December 15, 1986

## OPINION

*Before Robert Yazzie, District Court Judge.*

*Donna C. Chavez, Esq. and Elouise Chicharello, Esq., Navajo Nation
Department of Justice, Window Rock, Arizona for the Plaintiff; Robert
J. Wilson, Esq., Gallup, New Mexico and John Yellowhorse, Esq.,
Houck, Arizona for the Defendants.*

*Opinion delivered by Yazzie, District Court Judge.*

### Statement of the Case

This action involves a suit on four separate claims against the defendants for damages for: Breach of Contract, Breach of Bailment / Conversion, Negligence, and Fraud. These four claims arise from a management contract entered into in 1982, between the Navajo Nation and Yellowhorse, Inc., to operate an arts and crafts purchasing and marketing program to benefit individual Navajo artisans, thereby relieving some of the unemployment problems on the Navajo Reservation.

### I. Findings of Fact
### Parties

1. Plaintiff, the Navajo Nation, is a federally recognized Indian tribe occupying and enjoying the beneficial ownership of the Navajo Indian Reservation.

2. Defendant, Jane Yellowhorse Jones, is an enrolled member of the

Navajo Nation and at all times referred to in this cause of action, she operated a business and resided within the exterior boundaries of the Navajo Indian Reservation.

3. Defendant, Dennis Jones, is a non-Indian and at all times referred to in this cause of action, he resided within the exterior boundaries of the Navajo Indian Reservation. Jane and Dennis Jones testified that they were married by a medicine man on December 28, 1978, though evidence was entered that they submitted a sworn affidavit to the Navajo Nation on July 27, 1981, that they were married on June 06, 1981. (See Plaintiff's Exhibits 5 and 6).

4. Defendant, Mary Ann Yellowhorse, is an enrolled member of the Navajo Nation and at all times referred to in this cause of action, she worked within the exterior boundaries of the Navajo Indian Reservation.

5. Defendant, Betty Yellowhorse Chauncey, is an enrolled member of the Navajo Nation and at all times referred to in this cause of action, she worked within the exterior boundaries of the Navajo Indian Reservation.

6. Defendant, John Chauncey, is a non-Indian who resides off the Navajo Indian Reservation in Albuquerque, New Mexico, but who burglarized the Fort Defiance Trading Post on April 04, 1982, and thereby submitted himself to the jurisdiction of the Navajo Nation.

7. All of the acts underlying the cause of action occurred within the exterior boundaries of Navajo Indian Country.

8. Yellowhorse, Inc., was a corporation under the laws of the State of Arizona on December 09, 1982, by Jane Yellowhorse Jones, President, and Dennis Jones, the only other officer of the corporation.

## Chronology of Events Leading to the Burglary of the Arts and Crafts

The facts involving these claims center around this essential chronology of events:

### AUGUST 02, 1982—NAVAJO NATION ENTERED INTO A ONE-MILLION DOLLAR ($1,000,000) CONTRACT WITH YELLOWHORSE, INC.

9. On December 9, 1982, Defendants, Jane Yellowhorse Jones and Dennis Jones, purported to form a corporation called "Yellowhorse, Inc." of which they were officers. (See Plaintiff's Exhibit 7).

10. On August 2, 1982, the Navajo Nation and Yellowhorse, Inc. entered into a valid and binding management contract in the amount of one (1) million dollars. The contract was entirely funded by a Federal ANA

Grant. It was to be administered from the Fort Defiance Trading Post, a.k.a. J.D's Market, where Defendant Jane Yellowhorse Jones held a business site lease. (See Plaintiff's Exhibit 8, the management contract).

11. The purpose of the contract was to expand the opportunity for individual Navajos to sell their jewelry and help relieve the unemployment problem on the Navajo Reservation. The contract authorized defendant to purchase and market Navajo Arts and Crafts with title of such property remaining in the Plaintiff Navajo Nation. The period of the contract was from August 02, 1982, through December 31, 1982.

12. The contract required Defendant Jane Yellowhorse Jones to comply with the contract provisions, which expressly included:

A) Being responsible for the physical custody and storage of the arts and crafts inventory;

B) Maintaining adequate inventory control records;

C) Providing adequate security of the arts and crafts inventory; and

D) Purchasing an insurance policy for the inventory.

13. Defendant Jane Yellowhorse Jones understood the contract provisions as they were discussed with her in detail. Ms. Jones is an experienced dealer in selling and buying Navajo Arts and Crafts, and has been in the business for twenty (20) years.

14. The contract expired on December 31, 1982, but was extended by written modification to December 31, 1983, by the Navajo Nation. (See Plaintiff's Exhibit 74). An express term of the provisions of the original contract, including insurance to be provided by defendants, was to remain in effect, except that no new purchase could occur until sale of 50% of the inventory on hand was done.

## JANUARY 14, 1983—SEIZURE OF
## YELLOWHORSE TRADING POST

15. During the January 11, 1983, inauguration of Chairman Peterson Zah, boxes containing tribal records were reported missing from the offices of the Chairman. A search was undertaken by Navajo Police Officers to locate the missing boxes.

16. On January 14, 1983, Ross Bigman, a BIA Law Enforcement Officer, who was aware of the missing tribal documents, observed boxes with Navajo Tribal markings being removed from the J.D. Market at Fort Defiance to a 1977 Ford Van. He contacted Navajo Police immediately, who arrived shortly thereafter, and discovered boxes of tribal records in the van as well as within a freezer inside the trading post. These were identified as those records missing from the Navajo Tribal Administration Building.

In locating the boxes, Tribal officials discovered a vault in the trading post containing a large amount of arts and crafts. Defendant Dennis Jones

informed the Tribal officials at the time that the arts and crafts were the property of the Navajo Nation.

17. Several witnesses for the Navajo Nation testified that sealing of the vault and securing of the arts and crafts was necessary, because Tribal officials had no knowledge about the Yellowhorse, Inc. contract with the Navajo Nation. There was ample evidence that Howard Bitsuie, former Director of Chapter Development, knew about the contract and had informed Colonel Larry Benallie of the Navajo Division of Public Safety. Eric Eberhard stated that he might have known about the contract before January 14, 1983, but got a copy of the contract a few days later.

Harry Sloan, the accountant, testified that he was on the 1982 Zah Transition Team and explained about the Jones' contract and missing inventory to Mr. Eberhard in December 1982. At the time the vault was seized, auditors of Sloan and Company were in the vault doing an ongoing inventory. Mr. Sloan explained at the time that there was a contract between the Defendant Jones' and the Navajo Nation. Therefore, on January 14, 1983, the Navajo Nation was on notice that a contract existed between the Defendant Jones' and the Navajo Nation. A few days later they had received a copy of the contract.

18. On January 14, 1983, Colonel Benallie then ordered the vault sealed with tape, and a temporary police guard was placed outside the vault door for two weeks. Since no security guard was present at the Fort Defiance Trading Post on January 14, 1983, Colonel Benallie ordered sealing the vault to ensure security and protecting the merchandise from theft. For protection and security of the vault, security guards were posted using Navajo Police Officers to maintain a 24-hour security from January 14, 1983 to January 31, 1983. This was done on a temporary basis. The Navajo Police vacated the premises on January 31, 1983 and Jane Yellowhorse Jones continued to operate the J.D. Market.

19. The vault was sealed. Defendants Jane and Dennis Jones were told that no one could enter without permission of the Navajo Nation. Mr. and Mrs. Jones were the only persons who knew the combination to the vault.

20. Plaintiff's witnesses claim that defendants did not object to the sealing of the vault, and that Dennis Jones was very cooperative and accommodating. In fact, defendants were silent when orders were made to seal and secure the vault.

21. While the vault was closed, the grocery store portion of the trading post was still open for business. Defendant Jane Yellowhorse Jones never gave the vault combination to Navajo Police or officials. The Jones' did not continue to operate the arts and crafts program. On one hand, no Tribal official told them specifically that the contract was terminated in January 1983. On the other hand, no one told the Jones' to continue the contract.

APRIL 05, 1983—ARTS AND CRAFTS BURGLARIZED

22. On Monday night of April 4, 1986, arts and crafts with a cost price of $261,077.75 were stolen from the vault at Fort Defiance Trading Post. A large quantity of jewelry was taken away in duffel bags and gunny sacks by the burglars. (See testimony of Russell Urban; on the amount of inventory stolen, see Plaintiff's Exhibits 61 and 111).

23. Three (3) non-Indians were involved with the theft: John Chauncey, Russell Urban, and Abraham Baldazon. They have all confessed to the burglary of the trading post. They all have been arrested, convicted and sentenced pursuant to plea bargains.

24. Russell Urban, at trial, voluntarily admitted that he and John Chauncey and Abraham Baldazon were responsible for the break-in and theft. He said, "we stole the jewelry" and "it was a safe job." Defendant John Chauncey guaranteed them that the owners of the Fort Defiance Trading Post would be in Albuquerque at a basketball game on the evening of April 04, 1983, and the next early morning hours of April 5th. Defendants, Jane Yellowhorse Jones and Dennis Jones, testified that they were at a basketball game in Albuquerque, New Mexico when the burglary took place on April 4th.

25. According to Russell Urban, John Chauncey was a professional burglar who carefully planned and set up his jobs to minimize the risk. This was accomplished by obtaining inside information from simply being able to personally visit and case the burglary targets. Such was the case at the Yellowhorse Trading Post. He was involved with several burglaries before. Russell Urban testified that he had participated in numerous burglaries with John Chauncey, including one at Black Hat Trading Post in 1980, during the time Jane Yellowhorse and her former husband, Russ Lingren, owned the Black Hat Trading Post. In previous burglaries with John Chauncey, Urban testified that Chauncey was always the ring leader.

26. The burglary at the Yellowhorse Trading Post was planned beforehand by Defendant John Chauncey. He arranged the date for the burglary. He knew where the vault was. He knew the inside layout of the vault. Before the burglary Defendant John Chauncey punched a hole through the cinder blockwall from the outside where the break-in would take place.

27. The defendants and the confessed burglars all knew each other. John Chauncey was formerly married to Betty Chauncey. He also knew Defendants Jane and Dennis Jones. Russell Urban became acquainted with John and Betty Chauncey in 1980, when they became engaged in the Indian jewelry business. On April 03, 1983, the night before the burglary, Defendants, Jane and Dennis Jones, John Chauncey, and Betty Chauncey and her boyfriend Randy Zaragoza, all stayed at the Classic Hotel in Albuquerque, New Mexico. Classic Hotel records show that John Chauncey

rented two rooms at that hotel on March 31, 1983. Betty Chauncey testified that she and Randy Zaragoza were in Albuquerque on March 30 or 31, 1983. The Classic Hotel records also show that John Chauncey, Randy Zaragoza, and Jane and Dennis Jones registered at the hotel on April 03, 1983. Betty Chauncey testified she also stayed at the Classic Hotel on April 03, 1983. On April 29, 1983, three (3) weeks after the April 4th burglary, John Chauncey and Randy Zaragoza again stayed at the Classic Hotel according to hotel records. (See Plaintiff's Exhibits 3(a) thru 3(e)). As a result, plaintiff claimed that there was a conspiracy by the defendants and the burglars to steal the arts and crafts. There is insufficient evidence of the purported conspiracy.

## WEAK SECURITY

28. At the time of the April 4th burglary, the only security measure used by Defendant Jane Yellowhorse was a small portable sonaguard alarm system at night. The alarm was purchased about two (2) weeks before the burglary. No security guard was on duty during the burglary. Defendant Jane Yellowhorse Jones admitted that no security guard was provided by her after the first week in February, 1983. The security measures used by defendants was not by any means adequate.

Nora Wauneka, former employee of the Jones' explained that the sonaguard alarm system could not be heard from outside the trading post. She further testified that on April 4, 1983, before the burglary, the alarm accidently set-off while a police officer was passing outside and the officer did not respond. Russell Urban stated that the alarm only sounded for about one minute. (See testimony of Russell Urban.)

29. The investigation reveals that the vault wall, the break-in area, was blown by a sledge hammer. A crow bar was also used. Russell Urban testified that John Chauncey told them beforehand that burglary tools (sledge hammer and crow bar) were placed near the rear (east side) of the Fort Defiance Trading Post. Mr. Urban said, "It was an easy hit." "We knocked out five (5) cinder blocks with the sledge hammer and made a hole where we entered." Debris was later found in and outside the wall. (See testimony of Ross Bigman, BIA Criminal Investigator; see also photographs of the break-in area, Plaintiffs Exhibits 19 and 20).

30. Pat Callahan, a radiographic examination expert in wall construction and a structural engineer, x-rayed the entire wall of the vault room at the Fort Defiance Trading Post in which the burglars entered. He concluded that there was absolutely no metal of any kind within the walls, only cinderblocks. The vault wall was constructed entirely without steel or metal reinforcement. (See Plaintiff's Exhibit 88).

31. Under the contract, at paragraph XXXV(a)4 and 7, defendants

were required to maintain protection, and be responsible for the care and safekeeping of the arts and crafts inventory.

32. The Navajo Nation was not specifically aware of the sonaguard alarm system or the lack of reinforced walls in the vault prior to the burglary. However, the Navajo Nation was on notice that the Jones had not complied with several contract requirements, especially insurance coverage and lack of fidelity bonding for employees.

33. Jack Downey, an expert witness in the field of insurance, and William Taylor, an insurance salesman, both testified that qualification for adequate security for insurance on one million dollars worth of Navajo arts and crafts would require proper security measures such as bolted doors, window covers, and an adequate alarm system and safe, as well as locked jewelry cabinets. Alton Pichard, an expert Indian arts and crafts appraiser and dealer, testified that these requirements would be deemed the standard practice in the Indian arts and crafts industry, and that he always carried insurance on his Indian arts and crafts business.

## NO INSURANCE COVERAGE

34. At no time during the entire period of the contract did Yellowhorse, Inc., ever insure the arts and crafts inventory. (See Plaintiff's Exhibits 73A through H). The management contract at paragraph XXXIII clearly says:

"The contractor shall secure, pay premiums for, and keep in force until the expiration of this contract or any renewal period thereof. . . arts and crafts will be insured for at least the amount of their wholesale value."

35. Although a jeweler's block application was sent to Jane Yellowhorse Jones by William Taylor of Marsh and McClennan Insurance Company on September 23, 1982, Ms. Yellowhorse claims she was unable to obtain insurance. Although Tribal officials during the MacDonald administration did assist Defendant Jane Yellowhorse Jones in applying for other insurance, she never applied. William Taylor contacted Defendant Jane Yellowhorse Jones and discussed the requirements for filing an application for Jeweler's Block Insurance. (See Plaintiff's Exhibit 82 and testimony of William T. Taylor).

36. Defendant Jane Yellowhorse Jones attempted to modify the contract by having the insurance requirement waived. On January 05, 1983, the Budget and Finance Committee of the Navajo Tribal Council, instead of changing the contract to waive insurance, merely reaffirmed the contract in its entirety, including the insurance and security requirements. If the Navajo Nation ever intended to waive insurance it would have modified the contract. On the other hand, from the entry of the contract to January 11, 1983, and April 06, 1983, the tribe did not take affirmative

steps to enforce the insurance coverage clause. Even though Defendant Yellowhorse never complied with the insurance requirement, the Navajo Nation did not attempt to formally terminate the contract until after the burglary of April 4, 1983.

37. Defendant Jane Yellowhorse Jones claimed that no insurance company would insure arts and crafts businesses on the Navajo Indian Reservation, because it was considered too risky, and therefore it was impossible to obtain insurance on the arts and crafts program she administered for the Navajo Nation. Jack Downey, an expert in the insurance brokering business, testified that such insurance was readily available to Indian arts and crafts businesses like the one run by the Jones. Mr. Downey testified that this insurance availability was present for many years prior to and including 1982.

38. Clearly, Defendant Jane Yellowhorse Jones never had insurance coverage, although she was obligated to do so under the contract. It was her responsibility to pay for the insurance.

## SALE OF STOLEN ARTS AND CRAFTS

39. Much of the jewelry and other craft items stolen on April 04, 1983, were never recovered. Plaintiffs assert the lost items amount to $261,078 in purchase value. (See Plaintiff's Exhibit 61, page 5). The F.B.I. Agent, Charles Moffett, recovered or identified some items in the possession of Manuelita Wagner, a retail seller of Indian jewelry in Albuquerque, who knew Betty Chauncey and regularly purchased jewelry from Ms. Chauncey. Mr. Moffett also recovered other items from a search warrant upon Abraham Baldezon's home. (See Plaintiffs Exhibit 1 and 2). Mr. Baldezon was one of the burglars of the Yellowhorse Trading Post. Betty Chauncey testified that she did not contact law enforcement officials.

Russell Urban testified that he sold Betty Chauncey some of the jewelry stolen from the Yellowhorse Trading Post. She told him she recognized the jewelry and he confirmed where the items came from. She paid him for the jewelry; she never contacted law enforcement officials.

Ms. Wagner testified at her deposition, Page 9, (Plaintiff's Exhibit 99), that Justin Morris identified two bracelets and a necklace in her possession as his work; that he said he had sold those items to the Fort Defiance Trading Post which was robbed. Ms. Wagner bought those items from Betty Chauncey in the summer of 1983. Justin Morris' testimony corroborates Ms. Wagner's deposition. He recognized the remaining three items of jewelry sold to Ms. Wagner by Betty Chauncey. He had not sold the bracelets and necklace to Ms. Wagner himself, but recalled that the items he sold the Navajo Tribe's program were special, because he made them heavier; that is with more silver.

Betty Chauncey's jewelry purchases from Russell Urban was of needlepoint design. Justin Morris did not make needlepoint jewelry. By her own admission, Betty Chauncey purchased stolen jewelry from Urban. Its disposition is unknown. The Justin Morris jewelry that came into possession of Manuelita Wagner was sold to her by Betty Chauncey shortly after the burglary in Fort Defiance. Betty Chauncey testified that she had bought jewelry from the arts and crafts program, which was made by Justin Morris, however, there is no evidence to support her claim. To the contrary, there is solid evidence from the program records examined by Harry Sloan that all sales by the program were recorded on sales invoices as well as in a ledger, and these records show that Betty Chauncey never purchased any jewelry made by Justin Morris. Mr. Morris easily identified his jewelry as items he had made specifically for the Yellowhorse project, with a heavier silver weight.

## OTHER MISSING INVENTORY

40. Separate and apart from the April 4th burglary incident, Sloan and Company's closeout audit report shows that from August 05, 1983, through December 31, 1982, $24,313.75 worth of arts and crafts are unaccounted for. Some of the missing inventory were found through a recount, but $10,000 to $12,000 of inventory were still missing prior to the April 04, 1983 burglary. (See Plaintiff's Exhibit 62 at p. 5, item 3(b)(i)(4)).

## APRIL 06, 1983—LETTER TO TERMINATE YELLOWHORSE, INC., CONTRACT

41. Chairman Peterson Zah's letter of April 06, 1983, purports to terminate the management contract for the convenience of the Tribe. (See letter of termination, Plaintiff's Exhibit 91).

## DISALLOWED COST REPAID TO ADMINISTRATION FOR NATIVE AMERICANS (ANA)

42. Plaintiff Navajo Nation was required to reimburse ANA the amount of loss from the burglary, $261,078.00, as disallowed costs at wholesale value. The Navajo Nation had to bear the loss from its own treasury because there was no insurance coverage. (See Plaintiff's Exhibit 92, 93, 94, 95 and 95(a)).

## CHECK WRITING SCHEME TO INDIVIDUAL NAVAJO ARTISANS BEFORE THE APRIL 4TH BURGLARY

43. Plaintiff alleges that defendants committed a fraud through a check

writing scheme. As a part of the management contract, Defendant Jane Yellowhorse opened and maintained a special account with the First Interstate Bank, Gallup, New Mexico. All payments advanced to defendants for the operation of the management contract were deposited into the special account. That was part of the contract agreement. Defendants, Jane Yellowhorse Jones, Betty Chauncey, and Mary Ann Yellowhorse were authorized to sign the special account checks for payment of arts and crafts purchased.

Whatever amount of money in the account at different times during the life of the management contract, the Navajo Nation never took possession nor regained control of the special bank account at any time, until the letter of April 06, 1983, was sent to terminate the contract.

44. Plaintiff claims that defendants wrote checks to each other. There is insufficient proof as to this claim. The plaintiff presented, however, sufficient evidence that Defendant Jane Yellowhorse Jones wrote checks from the special bank account to five (5) Navajo individuals whose names and addresses are fictitious. They have no census numbers and no voter registration records that correspond with where they supposedly resided. All of these fictitious persons were sent certified letters by the plaintiff at their purported address and all were returned as unclaimed (See Plaintiff's Exhibits 98(a) thru 98(I)). These individuals were all "issued" checks signed by Defendant Jane Yellowhorse Jones:

A) Alice Mae Douglas of General Delivery, Mentmore, New Mexico, $645.00 on December 30, 1982;

B) Bob Billie of Post Office Box 98, Fort Defiance, Arizona, $600.00 on December 30, 1982;

C) Rose Mary Peters of Post Office Box 9, Thoreau, New Mexico, $740.00 on December 30, 1982;

D) Frank Begaye of General Delivery, Ganado, Arizona, $152.00 on December 31, 1982;

E) Ivan Kellywood, $400.00 on December 30, 1982;

The following two individuals were not fictitious persons; however, there were program checks issued to them and evidence shows:

A) Jim V. Begaye, by his own testimony did not sell any jewelry to the program on December 30, 1982, nor did he receive or sign a check for a sale on that date issued by Jane Yellowhorse Jones. Mr. Begaye testified his signature was not on the back of the check (Plaintiff's Exhibit 6) and the expert document examinee, Ronald Metzger, testified that the signature on the December 31, 1982, check was not Mr. Begaye's signature based on comparison with samples of his true signature.

B) Louise Morgan testified that she might have sold to the program in December 1982, and that the signature on the check made out to her on December 30, 1982 (Plaintiff's Exhibit 14), was not

signed by her, but could have been made by her daughter. The expert document examiner in comparing that check with Ms. Morgan's true signature testified that they were signed by two different persons.

45. Plaintiff has presented ample expert testimony that the checks issued to the above-named payees are undoubtedly forged. Though the signatures of these fictitious payees are non-genuine, it is unclear as to who actually signed the checks as payees. It is also unclear as to which defendants, if any, actually forged the checks, although it is clear that Ms. Jones signed these checks as payor. (See testimony of Ron Metzger, expert document examiner).

46. Plaintiff further presented evidence that Defendant Jane Yellowhorse Jones, paid her mother, Anna M. Tahy, $12,000 for purchase of a rug only worth $6,000. There is evidence that the check issued was not signed by Anna Tahy. See testimony of Ron Metzger and Alton Pichard.

## II. Procedural History

1. Plaintiff filed its original complaint on April 30, 1984. First and second amended complaints were then filed. Thereafter, several pre-trial motions, including discovery requests, motions to dismiss and for summary judgment, were filed.

2. The trial in this case began with the plaintiff presenting its case-in-chief on March 10, 1986, and finishing on March 24, 1986; a total of 14 days.

3. After plaintiff presented its case-in-chief, the Jones' Counsel, Robert J. Wilson, orally moved to dismiss the entire case.

This court allowed the defendants leave to file a written motion and a brief. After several extensions upon their request, defendants filed a motion to dismiss and brief on April 07, 1986. Plaintiff's responsive brief opposing the motion to dismiss was filed on April 22, 1986.

Defendants, Betty Chauncey and Mary Ann Yellowhorse, did not file a motion to dismiss *until* April 16, 1986. Plaintiff filed a response on April 25, 1986. This matter was set to resume on June 03, 1986, with written and proper notice to all parties.

4. On the morning of the scheduled hearing, June 03, 1986, Defendants, Jane Yellowhorse Jones and Dennis Jones, and their Counsel Robert J. Wilson did not appear. Daniel Deschinny, who was allowed to enter as co-counsel with Robert Wilson at the beginning of the trial appeared. Mr. Wilson filed a written motion to vacate the June 03, 1986, hearing. The motion requested for additional time to duplicate the overall plaintiff's testimony and thus prepare an adequate defense. Since the plaintiff finished

its case on March 24, 1986, defendants had sixty (60) days to duplicate the tapes and prepare a complete defense. The court denied such a last minute request. Defendants were not, however, denied a right to duplicate the tapes. This court granted defendants' permission to duplicate the tapes of the entire proceeding. But a request for additional time to prepare a defense simply offered no legitimate reason to further delay the June 3rd trial date.

The case was scheduled to reconvene for trial on June 03, 1986, to allow defendants to present their case. Only Defendants' counsels, John Yellowhorse and Daniel Deschinny, appeared on June 03, 1986. Mr. Deschinny respectfully requested this court to allow him to withdraw from the case, because he stated that his client, Dennis Jones, had ordered him not to appear before this court, and that if he did so, he was fired. Mr. Deschinny was allowed to withdraw as co-counsel of record for Defendants Jane and Dennis Jones. The trial was continued to June 04, 1986, with notice to all parties. On June 4th, this court delivered its oral decision on the motion to dismiss in open court. While other Defendants, Betty Chauncey and Mary Ann Yellowhorse, appeared through their legal counsel, Defendants Jane Yellowhorse Jones, Dennis Jones and their attorney Robert J. Wilson deliberately refused to appear. They never presented their defense, despite an *advance notice* of twenty-nine (29) days, plus almost two years from the date the complaint was filed.

5. When plaintiff ended its case on March 26th, the defendants had sixty (60) days, which is indeed ample time to prepare a defense.

6. Regarding failing to appear of Defendants, Jane Yellowhorse Jones and Dennis Jones, and their attorney, a *written notice* of the June 3 trial date was properly given by this court to all parties, thus allowing defendants twenty-nine (29) days to prepare a defense.

7. On June 3rd, at the instruction of this court, Violet A.P. Lui, Associate Attorney to the Solicitor of the Courts of the Navajo Nation, personally telephoned the office of Defendant's Counsel, Robert J. Wilson, and left a message for him that the June 3rd trial date would be continued to June 04, 1986. Despite this express notice, neither Mr. Wilson nor his clients appeared for the June 4th hearing.

8. Pursuant to the 1968 Indian Civil Rights Act, Defendants Jane and Dennis Jones' right to appear and present their case have been judiciously protected by this court.

9. On June 04, 1983, this court orally ruled on defendants' motion to dismiss, which was granted in part and denied in part. The ruling to each of the four (4) counts is summarized at the beginning of each count in the following opinion. The court allowed the plaintiff to change Count IV, to a claim for negligence, to conform with the evidence presented.

10. No motion for reconsideration was requested by defendants to modify the June 4th decision. It stands as ORDERED.

11. Defendant John Chauncey did not participate in the proceeding at all. The record is clear that he was properly served with a complaint and summons well before the trial date. A judgment by default is entered against Defendant John Chauncey.

12. Defendants Jane and Dennis Jones' Counsel, Robert J. Wilson, filed an application for writs of prohibition and mandamus against this court, which was summarily dismissed by the Navajo Nation Supreme Court on June 06, 1986, for failure to allege legal grounds for the writs and for inability of Counsel Robert J. Wilson to practice in Navajo Tribal Courts, while suspended from practice.

## III. Issues

Plaintiff filed the second amended complaint on December 19, 1986, consisting of four counts. Count I: *Breach of Contract*. Count II: *Bailment/Conversion*. Count III: *Negligence*. Count IV: *Conversion* amended to negligence.

In view of the evidence presented, each of the four (4) counts will be examined separately. They will be addressed in terms of these issues:

COUNT I: Did defendants breach their contract with the Navajo Nation for failing to maintain insurance and adequate security system of the arts and crafts inventory?

COUNT II: Did defendants breach their duty as bailees by not providing insurance and keeping the arts and crafts inventory in a safe and secure place? Did defendants participate in the burglary so it could be said that they conspired to convert the arts and crafts to their use?

COUNT III: Did the defendants breach their common law duty of care to plaintiff by failing to provide reasonable security and insurance for the arts and crafts in their possession?

COUNT IV: Did Defendants, Jane Yellowhorse Jones, Betty Chauncey, and Mary Ann Yellowhorse, handle the special bank account, check transactions, and the monies of the Plaintiff Navajo Nation in a negligent manner?

## IV. Opinion

### Count I: Breach of Contract

ISSUE I: DID DEFENDANTS JANE AND DENNIS JONES ACTING
AS AGENTS FOR YELLOWHORSE, INC. BREACH THEIR
CONTRACT WITH THE NAVAJO NATION FOR FAILING TO
MAINTAIN INSURANCE AND ADEQUATE SECURITY SYSTEM
OF THE ARTS AND CRAFTS INVENTORY?

*A. The claim against Jane and Dennis Jones for the period of August
1982 through January 14, 1983.*

The evidence presented by plaintiff in their case-in-chief is sufficient to support the breach of contract claim in Count I against Defendants, Yellowhorse, Inc. and Jane and Dennis Jones, for the period August, 1982, to January 14, 1983. Plaintiffs also presented sufficient evidence to show a loss of inventory by Defendants, Yellowhorse, Inc., Jane and Dennis Jones, of the plaintiff's arts and crafts program during the period of August, 1982, to January 11, 1983, and that said defendants were responsible for the inventory loss. The motion to dismiss on this claim was therefore DENIED.

In an action for a breach of contract, the party who suffers from the non-performance of the contract may recover compensatory damages if these elements are proven:

1. The parties who breached the contract have a contractual duty to perform the contract;
2. The breaching party failed to perform a contractual obligation, and
3. The non-breaching party suffers a loss as a result of the breach.

There is no breach of contract where the party who allegedly breached proves legal excuse for failure to perform.

In the present case, the audit report of Sloan and Company shows missing inventory worth $10,000.00 to $12,000.00 at the end of the initial contract on December 31, 1982. Defendant Jane Yellowhorse Jones entered into a contract with the Plaintiff Navajo Nation for the period August 2, 1982, to December 31, 1982, later extended to December 31, 1983. She was required to purchase insurance for the inventory at wholesale value until the contract expired or was renewed. The defendant was further required to maintain adequate inventory control and security system for the period of the contract. The maintenance of inventory control also required the defendant to maintain books, records, documents, and accounting procedures and practices sufficient to reflect properly all cost of whatever nature incurred in the performance of the contract and current inventory. (See Plaintiff's Exhibit 8, p. 12, item 8).

There is ample evidence that Defendant Jane Yellowhorse Jones never complied with specified requirements to secure and maintain inventory or

to maintain records and procedures sufficient to properly reflect all costs and inventory. Harry Sloan indicated in his testimony that there was never an adequate maintenance of records and inventory control practices by Yellowhorse, Inc. He further testified that records were not being maintained in a timely manner and that the bookkeeping was poorly maintained throughout the period of the contract. Defendant Jane Yellowhorse Jones had a duty to fulfill the contract and failed to do so.

Because Defendant Jane Yellowhorse Jones failed to comply with the contract requirements, there was a breach of contract for failing to insure inventory, and to maintain inventory control and security system through January 14, 1983. This court also concludes that the missing inventory of $10,000 to $12,000, was a result of the defendants' failing to maintain an inventory control and security system, and failing to insure the inventory as required by contract. As a consequence of defendants' breach, Plaintiff Navajo Nation suffered a loss of $10,000 to $12,000.

The contract also expressly required Defendant Yellowhorse, Inc. to purchase insurance at wholesale value. She argued that she was unable to get insurance for the period of the contract. The Tribal officials knew of this requirement and yet never compelled performance. If the Tribal officials knew of the insurance requirement and failed to enforce its terms, did lack of enforcement mean the insurance requirement was waived? Not so. The Navajo Nation never waived the insurance requirement at any time. In fact, when the contract was renewed, the Budget and Finance Committee of the Navajo Tribal Council, on January 05, 1983, by resolution reaffirmed the contract, including the requirement for insurance and security. (See Plaintiff's Exhibit 74).

The Defendant Jane Yellowhorse Jones well understood the contract provisions. Being an experienced dealer in selling and buying Indian arts and crafts for twenty (20) years, she knew the requirements of maintaining the insurance, security and inventory control. By contract she had to fulfill those duties. She did not do so.

Regarding the amount of missing inventory, this court finds plaintiff was damaged in the amount of $11,000.00. The plaintiff proved that $10,000 to $12,000 of inventory is missing. The defendant, on the other hand, offered no help to ascertain how much was lost.

This court agrees with the plaintiff that "only reasonable certainty is required" to prove the fact and cause of injury to a party, but "the amount of damage, once their cause and fact are shown, need not be proved with the same degree of certainty." 22 Am.Jur. 2nd *DAMAGES*, §23 at 42. There is no bar to recovery if absolute certainty or exactness is not established through mathematic calculations, *Id*. at 42. Therefore, this court awards plaintiff damages based on the wholesale value of plaintiff's missing inventory prior to December 31, 1986. The amount of damages is

$16,500.00 plus prejudgment interest at 10% from December 31, 1982. (This wholesale value is $1.5 × $11,000; the cost price of the missing inventory. See the formula given by Alton Pichard, Plaintiff's Exhibit 64).

*Bryant et. al v. Mary I. Bryant,* 3 Nav. R. 200 (1982), left the question of prejudgment interest in the Navajo courts open, and provided guidance by stating, "the better rule is that prejudgment interest should be alleged and demanded in the complaint." *Id.* at *201.* Plaintiff Navajo Nation, in the instant case, did plead and demand prejudgment interest at the rate of 10%. This court will follow the principle that an award of prejudgment interest, if pled, is in the sound discretion of the trial court, and award prejudgment interest, because it can be measured with reasonable accuracy. 22 Am. Jur 2d *DAMAGES* §184. The measurement of the prejudgment interest should be from the date of loss to plaintiff, which was determined to be at least as of January 14, 1983, as testified to by Harry Sloan, to the time of verdict. However, in fairness to defendants, the time of verdict will be deemed to be the date this court denied defendants' motion to dismiss, which was June 04, 1986.

Therefore the remedy for prejudgment interest is calculated as follows:

10% of $16,500 = $1,650.00 divided by 365 days = $4.52 per day × 1260 days (from January 14, 1983 to June 04, 1986) = a total of $5,650 due the plaintiff in prejudgment interest plus the $16,500.

### B. The claim for breach of contract against Jane and Dennis Jones as agents for Yellowhorse, Inc. for the period of January 14, 1983, to April 06, 1983

There is not sufficient evidence to support plaintiff's breach of contract claims in Count I against Defendants Jane and Dennis Jones as agents for Yellowhorse, Inc., for the period of January 14, 1983, to the time of the burglary at Fort Defiance Trading Post on April 04, 1983. On January 14, 1983, the Navajo Nation regained possession by taking control of the vault from which the arts and crafts were stolen. The motion to dismiss was therefore GRANTED.

Despite Chairman Zah's intentions to be fair to the Jones' by not attempting to terminate the contract until April 06, 1983, the actions of the Tribal officials on January 14, 1983, in sealing and guarding the vault containing the arts and crafts for protection are actions of regaining possession and control of the vault. These acts had the legal effect of terminating the contract. The Tribal officials had knowledge of the existing contract during this incident. Howard Bitsui, former Director of Chapter Development, knowing about the contract, informed the Tribal officials about the contract. Therefore, there is no liability.

The defendants have raised the issue of impossibility of performance, in that Defendants Jane and Dennis Jones were unable to continuously perform the contract after January 14, 1983. This issue need not be addressed

because the contract was terminated on January 14, 1983, which legally excused Defendants Jane and Dennis Jones from further performance.

### C. The claim of breach of contract against Defendants Betty Yellowhorse and Mary Ann Yellowhorse.

The claim of breach of contract as to Count I; the motion to dismiss against Defendants Betty Yellowhorse Chauncey and Mary Ann Yellowhorse was GRANTED. Defendants Betty Yellowhorse Chauncey and Mary Ann Yellowhorse were never parties to the contract. This claim therefore does not apply to them.

## Count II: Tort: Bailment / Conversion

ISSUE II: DID DEFENDANTS BREACH THEIR DUTY AS BAILEES BY NOT PROVIDING INSURANCE AND BY FAILING TO KEEP THE ARTS AND CRAFTS IN A SAFE AND SECURE PLACE? DID DEFENDANTS PARTICIPATE IN THE BURGLARY SO IT COULD BE SAID THAT THEY CONSPIRED TO CONVERT THE ARTS AND CRAFTS TO THEIR USE?

### A. The claim for bailment against Defendants Jane and Dennis Jones for the period of August 1982, through Janaury 14, 1983.

There is sufficient evidence presented by plaintiff to show a breach of bailment contract in Count II against Defendants Jane and Dennis Jones for the period August, 1982, through January 11, 1983. The motion to dismiss this part of the claim was DENIED.

Bailment in its ordinary legal sense means the delivery of personal property by one person to another in trust for a specific purpose, with a contract, express or implied, that the trust shall be faithfully executed, and the property returned or duly accounted for when the special purpose is accomplished, or kept until the bailor reclaims it. The general rule that the assent of both parties is necessary before a contract, either express or implied in fact, can come into existence is applicable to the ordinary case of a contract of bailment.

In the instant case, this court finds that a bailment contract between the plaintiff and defendants arose through the arts and crafts management contract, and upon the receipt of monies by the defendants from the plaintiff. The receipt of money by Yellowhorse, Inc. constituted an express agreement by defendants to become bailee of the arts and crafts inventory for plaintiff. The bailment also included an agreement by defendants to provide insurance and to keep the arts and crafts inventory in a safe and secure place until marketed or returned to plaintiff upon termination of

the bailment contract. The bailment arrangement between the parties created a duty of care on the part of defendants to provide reasonable care for the arts and crafts merchandise.

This court finds liability against Defendant Yellowhorse, Inc., for breach of bailment contract for the period August 1982, through January 14, 1983, for failing to return the bailed arts and crafts inventory or its equivalent value in money to the plaintiff; the damages to plaintiff are the wholesale value of the missing inventory. The plaintiff was damaged in the amount of $16,500.00, the wholesale value, calculated by multiplying 1.5 times $11,000.00; the cost price of the missing inventory. (See the formula given by Alton Pichard, Plaintiff's Exhibit 64).

### B. The claim of breach of bailment against Defendant Jane and Dennis Jones for the period January 14, 1983, to April 06, 1983.

Because the Navajo Nation took possession of the arts and crafts, on January 14, 1983, there was no breach of bailment contract by Defendants Jane and Dennis Jones. The motion to dismiss on this part of the claim was GRANTED.

Again, the act of sealing of the vault, placing Navajo Police guards to maintain security and protection of the inventory and giving verbal instruction to Defendants Jane and Dennis Jones not to enter the vault without prior permission from tribal officials, are acts of regaining possession and control of the arts and crafts inventory. These actions thus terminated the existing bailment contract between the plaintiff and Defendants Jane and Dennis Jones, as agents for Yellowhorse, Inc.

The plaintiff argued that the Navajo Nation did not regain possession of the arts and crafts on January 14, 1983, because Defendant Jane Yellowhorse Jones never gave up the vault combination to Tribal officials, nor did the plaintiff take control of the special bank account until the purported termination of the contract on April 06, 1983. The court holds that, even if plaintiff's allegations are true, defendants were no longer in possession and control of the arts and crafts as bailee after January 14, 1983.

### C. The claim for conversion against Defendants, Jane and Dennis Jones, and Mary Ann Yellowhorse

There is also not sufficient evidence of conversion in Count II against Defendants, Jane Yellowhorse Jones, Dennis Jones, and Mary Ann Yellowhorse. As to this claim the motion to dismiss is GRANTED.

A conversion takes place when a person takes property of another for his or her own use or benefit with the intent of permanently depriving the owner of such property.

The plaintiff further asserts by circumstantial evidence that prior to the April 04, 1983 burglary, the Defendants, Jane and Dennis Jones, and

Mary Ann Yellowhorse, conspired with other defendants to steal the arts and crafts. One of the pre-planning sessions supposedly took place at the Classic Hotel in Albuquerque, New Mexico, which involved a meeting among Defendants, Jane and Dennis Jones, John Chauncey, Betty Chauncey and Randy Zaragoza. Even if this were true, the evidence was insufficient to prove a claim for conversion based upon conspiracy.

### D. The claim for conversion against Defendants Betty Chauncey and John Chauncey.

Plaintiff has presented sufficient evidence to sustain a cause of action of conversion against Defendants Betty Chauncey and John Chauncey. The motion to dismiss is therefore DENIED.

Defendant Betty Chauncey purchased stolen jewelry from burglar Russell Urban. She also sold other stolen jewelry from the April 4th burglary to Manuelita Wagner, the retail seller of Indian jewelry. Mr. Urban testified that he sold Betty Chauncey jewelry he helped steal from the Yellowhorse Trading Post. Ms. Wagner, at Page 9 of her deposition, testified that she bought from Betty Chauncey two (2) bracelets and one (1) necklace. Justin Morris recognized three of the items that Ms. Wagner had purchased from Ms. Chauncey, as ones he had sold to Yellowhorse Trading Post before the burglary. This evidence clearly shows that Ms. Chauncey knowingly took stolen property of the Navajo Nation with the intent to permanently deprive the plaintiff of ownership.

Concerning Defendant John Chauncey, there is no question that he stole the arts and crafts valued at $261,077.75 from the Fort Defiance Trading Post on April 04, 1983. He confessed being responsible for the break-in and theft. There is ample evidence that he made all the necessary plans to carry out the burglary. He has therefore converted the $261,077.75 worth of goods for his own use and benefit with the intent to permanently deprive the plaintiff of ownership.

This court finds Defendants Betty Chauncey and John Chauncey liable for conversion of the lost inventory. Defendant John Chauncey must pay the Navajo Nation in the amount of $1.5 \times 261,077.75 = \$391,616.62$ plus punitive damages in the amount of $1,000,000.00. However, it is unclear as to how much of the stolen items were sold by Defendant Betty Chauncey for her profit after the burglary. Betty Chauncey did receive at least $200.00 from Ms. Wagner for jewelry that Mr. Morris sold to the Yellowhorse Trading Post, which was stolen on April 04, 1983. (See Plaintiff's Exhibit "4(a)" and "99"). As previously stated, "only reasonable certainty is required" to prove the fact and cause of injury to a party, but "the amount of damage once their cause and fact are shown need not be proved with the same degree of certainty." 22 Am.Jur. 2d *DAMAGES* §23 at 42. Betty Chauncey presented no evidence to rebut plaintiff's evidence, so this

court will recognize $200.00 as the cost price of the jewelry, and that it would have sold for retail value of $300.00, using the Pichard formulation of $200.00 × 1.5.

This court will allow plaintiff prejudgment interest per *Bryant, et. al. supra*, calculated as follows: 10% of $300.00 = $30.00 divided by 365 days = $.08 per day × 1156 days (April 04, 1983 to June 04, 1986) = a total of $95.00 is due the plaintiff from Betty Chauncey in prejudgment interest plus the $300.00.

This court agrees with plaintiff that punitive damages are allowed by Navajo Statute in this case. 7 N.T.C. Section 701 governs awarding of judgment by the Navajo Tribal Courts. Section (b) of this Statute allows for additional damages to a plaintiff where a defendant has deliberately inflicted the injury. This is analogous to the concept of punitive damages. In *Keeswood et. al. v. Navajo Tribe, et. al.*, 2 Nav. R. 46 (1979), the Navajo Court of Appeals recognized the right of a plaintiff to punitive damages, although in that case they were not awarded because of the absence of evidence of actual malice.

The act of Betty Chauncey, in buying stolen jewelry from Russell Urban which she knew belonged to the Navajo Nation, and then selling other stolen jewelry from the April 04, 1983, burglary and keeping the money, were deliberately and willfully meant to deprive the Navajo Nation of its property. Her actions were malicious, outrageous and wilfull, entitling plaintiff to punitive damages. Punitive damages are awarded to the Plaintiff Navajo Nation against Betty Chauncey in the amount of $10,000.00.

## Count III: Tort: Negligence

### ISSUE III: DID THE DEFENDANTS JANE AND DENNIS JONES BREACH THEIR COMMON LAW DUTY OF CARE TO PLAINTIFF BY FAILING TO PROVIDE REASONABLE SECURITY AND INSURANCE FOR THE ARTS AND CRAFTS IN THEIR POSSESSION?

*A. The claim of negligence against Defendants Jane and Dennis Jones.*

There is sufficient evidence in Count III, to show a finding of negligence by Jane and Dennis Jones in not securing insurance, nor providing adequate security on plaintiff's arts and crafts as is reasonable in the arts and crafts industry. Such failure resulted in a loss of plaintiff's property in April, 1983. However, as discussed below, the court finds that the Navajo Nation could have taken, and had a duty to take protective action for the arts and crafts in January 1983. Upon reconsideration, the motion to dismiss as to Count III is therefore GRANTED.

To prove negligence in this case, these elements of negligence set forth by the plaintiff, from *Robinson v. U.S.*, 382 F. 2d 714 (9th Cir. 1967), are:

1. The defendant has a duty to protect the plaintiff from the injury of which the plaintiff complains;
2. Defendant fails to perform that duty; and
3. Such failure proximately caused plaintiff damage.

The plaintiff in the present case argued that defendants owed a duty of care arising out of the contract to the plaintiff to provide insurance and security for the tribe's property. This is reasonable in the Navajo Arts and Crafts industry, as testified to by Alton Pichard, a long time Indian arts and crafts dealer. A breach of that duty of care by the defendants would have been the proximate cause of the damage if the contract had not been terminated from January 14, 1983. Since the contract was terminated, there is no basis to argue that the failure to have insurance or adequate security was the proximate cause of the loss of inventory. Instead, the proximate cause was the Navajo Nation's failure to take the arts and crafts to a more secured vault or to obtain insurance for valuable Tribal property.

Plaintiff is correct that the duty of reasonable care owed by defendants to plaintiff is not one of reasonable standard, but the standard applicable to the defendants in the trade, where a defendant had held himself or herself out to be experienced and trained. *Powder Horn Nursery, Inc. v. Soil and Plant Laboratory, Inc.*, 119 Ariz. 78, 579 P. 2d 582, 1978. Thus, the standard of care plaintiff must prove, if the defendant had a duty to the plaintiff, is that which is reasonable in the arts and crafts trade.

Plaintiff further contends that the standard of care in the arts and crafts industry includes maintaining insurance on arts and crafts and taking reasonable security measures. Alton Pichard, plaintiff's appraiser of arts and crafts, being experienced in Navajo Arts and Crafts for 35 years, testified that he owned a trading post for 25 years. Mr. Pichard testified that the common practice for securing Indian jewelry was to store the jewelry in an all metal vault. He also stated that he had carried an insurance policy to protect any loss. Numerous trading posts with large amount of arts and crafts, on the Navajo Reservation and other reservations, for many years were insured so long as there were adequate window coverings and a dead bolt lock on doors; showcases were locked and an adequate security system installed. In 1982 and 1983, there was coverage for Indian Arts and Crafts programs, which Jane Yellowhorse Jones operated for the Navajo Nation. Insurance market for such programs was a loose market, meaning insurance was available. (See testimony of Jack Downey, expert witness in insurance broker). It is clear from the facts, Jane and Dennis Jones did not maintain proper security; there was no security guard or alarm system

which could be heard from the outside of the trading post. The wall to the vault consisting of cinder blocks was simply inadequate.

This court is of the opinion that the Jones' were negligent in their care of the arts and crafts in the vault of their trading post. However, it is also the opinion of this court that the Navajo Nation was negligent in failing to take protective measures after January 14, 1983. Which party should take responsibility for the loss from the burglary? The court looks for guidance to another opinion of this same District Court, Honorable Tom Tso presiding, which defined what degree of care the Navajo Government must use for property of the Navajo people:

. . .We are dealing with the property of the Navajo people, an asset which all Navajo governmental administrations must treat with the greatest respect and care, . . .*Tome v. Navajo Nation*, 4 Nav. R. 159 (Window Rock D. Ct. 1983).

This court must conclude that all of the admissible evidence only establishes the poor judgment and management of the Jones', which supports a finding that their negligence caused the losses prior to January 14, 1983. However, as between the Jones' and the Navajo government, the Navajo Nation's negligence from that date to April 06, 1983, was a superseding cause of the loss from the burglary.

### B. The claim of negligence against Defendants Betty Chauncey and Mary Ann Yellowhorse.

The claim of negligence as to Count III, the motion to dismiss against Defendants, Betty Chauncey and Mary Ann Yellowhorse, was GRANTED. Since Defendants, Betty Chauncey and Mary Ann Yellowhorse, are not vested with the duty of care to plaintiff to provide reasonable security and insurance of the arts and crafts, the claim of negligence under Count III does not apply to them.

## Count IV: Tort: Negligence

ISSUE IV: DID DEFENDANTS JANE YELLOWHORSE JONES, BETTY CHAUNCEY, AND MARY ANN YELLOWHORSE HANDLE THE SPECIAL BANK ACCOUNT, CHECK TRANSACTIONS AND THE MONIES OF THE NAVAJO NATION IN A NEGLIGENT MANNER?

### A. The claim of fraud against Defendants, Jane Yellowhorse Jones, Betty Chauncey and Mary Ann Yellowhorse Brooks.

There is not sufficient evidence on Count IV to support a finding of fraud as to any defendants on Count IV, but there is sufficient evidence to

support a claim for negligence against Defendants, Jane Yellowhorse Jones, Betty Chauncey and Mary Ann Brooks in Count IV. Plaintiff was, therefore, allowed to amend its complaint to conform with the evidence presented on negligence. The motion to dismiss as to Count IV against these defendants was DENIED.

Based upon the Court's findings, Defendants, Jane Yellowhorse Jones, Betty Chauncey, and Mary Ann Yellowhorse, were authorized to sign checks from a special bank account with the First Interstate Bank, Gallup, New Mexico. The plaintiff's evidence shows gross mishandling of the special account monies which belonged to the Navajo Nation. Checks were written to Navajo individuals with fictitious names and addresses, and cashed with forged signatures. Furthermore, Anna M. Tahy, the mother of Jane, Betty and Mary Ann Yellowhorse, was overpaid $6,000.00 for a rug which should have cost only $6,000.00; Anna M. Tahy was paid $12,000.00. The defendants clearly had a duty of care to the Navajo Nation to take care of the special bank account. They failed to do so in a gross and reckless manner.

The court finds Defendants, Jane Yellowhorse Jones, Betty Chauncey and Mary Ann Yellowhorse, negligent in the handling of the plaintiff's money in the special bank account. They are individually, jointly and severally liable to plaintiff Navajo Nation in the amount of $18,615.00, plus $5,895.60 in prejudgment interest, and $50,000 in punitive damages.

## Order

Pursuant to the above opinion, it is therefore ordered, adjudged and decreed that:

A.  On Count I, Breach of Contract Claim, Yellowhorse, Inc. is liable for damages to the Plaintiff Navajo Nation in the amount of $16,500.00, plus prejudgment interest of $5,650.00. It is the Court's opinion that Jane Yellowhorse Jones, aka Jane Lingren, and Dennis Jones are not individually liable for these damages based upon the pleadings and evidence presented.

B.  On Count II, Breach of Bailment Contract, Yellowhorse, Inc. is liable for damages to the Plaintiff Navajo Nation in the amount of $16,500.00, plus prejudgment interest of $5,650.00. Jane Yellowhorse Jones and Dennis Jones are not individually liable for these damages based upon the pleadings and evidence presented.

C.  On Count II, Conspiracy and Conversion, John Chauncey is liable for damages to the Plaintiff Navajo Nation in the amount of $391,616.62, plus punitive damages of $1,000,000.00.

D.  On Count II, Conspiracy and Conversion, Betty Yellowhorse, aka

Betty Chauncey, aka Betty Lou Beasley, is liable for damages to the Plaintiff Navajo Nation in the amount of $300.00, plus $95.00 in prejudgment interest, and $10,000.00 in punitive damages.

E. Count III, Negligence, was dismissed against all defendants.

F. On Count IV, Negligence, Defendants, Jane Yellowhorse Jones, Betty Yellowhorse, aka Betty Chauncey, aka Betty Lou Beasley, and Mary Ann Brooks, aka Mary Ann Yellowhorse, are individually, jointly and severally liable to Plaintiff Navajo Nation in the amount of $18,615.00, plus $5,895.60 in prejudgment interest and $50,000.00 in punitive damages.

G. Each party is to bear their own court costs and attorney's fees.